Pleased to court, I'm John Henry Brown and I represent a gentleman named John Henry Casey, who was convicted and sentenced to 20 years in prison for a conviction from Wenatchee in Chelan County. Just a little background on this case. I was an awful trial attorney, although I was at the time spending time in Wenatchee because of some other things occurring there that we've all heard about. Mr. Casey was convicted of killing his wife, Dr. Rosemary Casey, who was a very well-known and well-loved member of the community. The population of Chelan County, if you find that point interesting, which I think is interesting, is about 65,000. The circulation of local newspaper there, the only local newspaper, is about 50,000. Dr. Casey, as indicated, was a very well-respected member of the Wenatchee Hospital, which is probably the largest employer in the city of Wenatchee. She was head of the women's clinic there and was well-known for her medical and civic duties. Mr. Casey was a stay-at-home father, the father of three children, and by the testimony of the trial from people who really knew the situation, his neighbors and others, he was an exemplary Mr. Mom. Mrs. Casey, Dr. Casey, was killed by a gunshot wound to her chest that occurred. Mr. Casey testified that the wound occurred while he was cleaning a hunting rifle. The state lost a lot of the evidence in this case, including the blouse that Dr. Casey was wearing at the time of her death. The evidence against Mr. Casey basically consisted of the fact that his wife had died, that his wife had been shot, that he was certainly in the proximity of the weapon, if not holding the weapon at the time. But other than that, there was very little evidence other than what I would like to call a lot of character assassination and gossip about Mr. Casey. My personal experience as a trial attorney is that when you see cases such as this where the state relies on basically gossip and opinions that were certainly untested by cross-examination in order to convict someone, it's a clear indication that the case is not very strong against the defendant. The problem for Mr. Casey was exacerbated by the admission of this testimony, which I will call opinion and gossip testimony, and then exacerbated by the prosecuting attorney's closing argument, which we as trial attorneys hear all too often, and which the courts are more and more now reversing when prosecutors suggest to juries that their only real responsibility is to determine whether so-and-so is telling the truth or whether so-and-so is lying. In this case, the prosecuting attorney on three different occasions said that directly to the jury. You must, the ultimate decision in this case, ladies and gentlemen of the jury, rests on whether you believe Dr. Casey, who, of course, was dead, or you believe John Casey's testimony, which, of course, takes the burden off of the state of proving all the elements of the case. As far as the change of venue issue is concerned, the facts meet the presumed prejudice standards set forth in the United States Supreme Court in Sheppard v. Maxwell, which is a probability of unfairness or prejudice from pretrial publicity. The community was saturated, literally saturated, with prejudicial and inflammatory publicity, not only from the media, but from the firsthand experience of the jurors and local talk in this small community. Members of the local community who had heard discussions of the facts of this case knew people involved in the case and knew the feelings of the community, particularly the opinion of those in the medical community that Mr. Casey was guilty. Where is the – the Cases live in what town, Chelan? In Chelan. No, no, I'm sorry. No, no, they live in Wenatchee. In Wenatchee. That's correct. Okay. And the trial was in Wenatchee? That's correct. The population of Wenatchee is 19,000. I just got that off the Internet this morning. Over one-third of the prospective jurors revealed in their juror questionnaire that they had formed an opinion about the case. Again, over one-third who were actually questioned during the voir dire process and not excused for hardship were excused because they had formed opinions as to guilt. During general voir dire, which is, of course, when all the potential jurors are present, when defense counsel asked how many had formed opinions, 24 prospective jurors raised their cards in addition to the juror being questioned. Jurors were aware of the fact that the primary newspaper, the Wenatchee World, thought Mr. Casey was guilty, and two people who sat on the jury regularly read the Wenatchee World. Mr. Fox, one of the jurors, said during general voir dire that he worked for the paper and that even though he was not in the editorial department, he would be influenced by the paper. Others thought that the newspaper was accurate. One of the jurors was a mispeople. I read the articles in the newspaper, and right now those articles state, quote-unquote, he's guilty. The paper included a statement by the prosecuting attorney that Mr. Casey had admitted shooting his wife. Another article focused on allegations that Mr. Casey was a callous, mean, and insensitive person. Many of the other jurors listened to the only radio station in the area, which was KPQ, which broadcast stories extensively throughout the county about this case. A number of the prospective jurors formed opinions or were aware of opinions in the community from listening to conversations and from people they knew, many from the medical profession. Example of one of the responses. I am leaning towards an opinion, but I don't really have one, and it's from the conversations that have been going around me. Another example, Ms. Armstrong, who had discussions with her daughter, who was Rosemary Casey's patient, and had Casey children at school, and had met Casey children at school where she taught, and had overheard many snippets of conversation. The prospective jurors knew the feeling of the community. They knew the witnesses, and they knew people who were patients or friends of Rosemary Casey. During trial, at least a couple of expectant mothers who were patients of Dr. Casey's were in the audience reacting with tears and emotions. The individual voir dire of the three jurors who sat on the jury showed the bias. Diana Simpson said, I don't believe, quote, I don't believe that guns go off accidentally in the hands of adults. Willings will listen, but felt Mr. Casey was guilty based on information that she had. Connie Lynn said that she knew it had been treated by Dr. Mike Anderson, who was a critical witness in this case and who was critical of Mr. Casey, and Dr. Lisa Patterson, who was also a witness in this case. That was a juror who actually sat. Patricia McLaren indicated during individual voir dire that some of the questions in general voir dire might lead some to us forming opinions. That is, she was aware of the opinions and feelings of the collective group of jurors during general voir dire. This is a concern that is often the case in cases, well-known cases, for lack of a better term. When did this trial take place? 1998. 1998. In well-known cases, when you do general voir dire very often, which is when all the jurors are there, one of the real difficulties is jurors who have formed an opinion will often talk about that during general voir dire, which all of the jurors, despite later individual voir dire, hear. And I think that we've demonstrated in our brief how that dynamic occurred in this case. Problems here were not limited to just the media coverage. There are also cases that are cited in our brief recognizing that there are factors which threaten jury impartiality in a small community. Widely held convictions that defendant is guilty regard some of those cases. Gossip, which is not only evident in this case but also admitted as evidence in this case, can contaminate with negative and prejudicial information.  Of course, it's a state case, but I think you can look at state cases in order to get some idea of the law from the standpoint of federal issue as to whether a fair trial has been provided without a change of venue. In that case, in People v. Williams, a juror pointed out you could not go for coffee without hearing about the case. There was an exact same quote here where a juror pointed out that you could not go for coffee in Wenatchee without hearing a discussion of the case. In the Williams case, a similar statement was made by a postman regarding conversations he was having on his route. Even though some of the more telling statements came during individual voir dire, those jurors were in a good position to know the temper of the town. In particular, Ms. Reed, whose boss knew Rosemary Casey, might have felt pressured to convict and others might have felt they had a duty in this small community to convict and to protect the community. The actual prejudice standard is also met in this case, we believe. The fact that the jurors may have said that they were impartial, of course, is not conclusive. This is a small town. Returning anything less than a guilty verdict in a case like this would be considered a betrayal of trust to the community. Mr. Casey was denied a right to trial before a fair and impartial jury is guaranteed by the 6th and 14th Amendments. I really have not in the 30 years I've been a trial attorney, and I'm also doing a lot more appellate work now, which I really enjoy, but trying many cases, I really have never experienced a case where there was such pretrial publicity and a combination of pretrial publicity in the one local red newspaper, the radio station, but also, more importantly, the small town comments. And I think that I'm not just saying that the record in this case demonstrates that from the statements made by the potential jurors. I guess your argument under the Edco standard has to be that because the State Court of Appeals recognized the applicable law that found that it was an error, so you would have to say that it unreasonably applied that law to the facts in this case. Correct. I think they did. They unreasonably applied the facts of this case as to the federal standards. So our position. Admittedly, the federal standard is stricter than the state standard, but I think even applying the federal standard, I mean, this is, I hate to use the word, it's not very legal, but this case was a nightmare for a defense attorney and probably the judge given the fact that everybody seemed to know everybody, and people who sat on the jury knew about the case, and people, jurors time after time, tried to tell the judge, Mr. Casey is not going to get a fair trial here. The Confrontation Clause case issue is very interesting, and I have some remarks prepared about the United States Supreme Court's recent decision in Crawford, which I've read a number of times and find interesting and also somewhat confusing in some ways. I'm sure you don't, but. My question about that case is, was the principle in Crawford, was it clearly established at the time that the state courts rendered their decision? I have to go back and look at Crawford again to see if this is one of those occasions where the Supreme Court has said, this is the role, and it's always been the role. Any person who would read the Confrontation Clause would know that. Or if it's one of the ones that said, no, we're going to change what the role on confrontation is. Well, I actually think Crawford, I think I can answer that, which may sound like it's undermining my position, but I think if you'll bear with me, it really doesn't. In that, I thought first of all, I thought Crawford was very interesting, because I think it's really wonderful once in a while to get a decision from any court that has such historical perspective and remarks, and I found it really very interesting. I think that Crawford basically said, as far as the admission of testimonial evidence, which is pretrial, it will never happen unless there's been cross-examination. Cross-examination, that is new. I, of course, think this is a very interesting question, which was left open by Crawford, and I talked to Professor Aronson about this yesterday, and he scratches his head in some ways, just like many of us do from reading Crawford, and that really, what is testimonial evidence? Is testimonial evidence limited to just simply prior depositions? Clearly not. In this case, in the Crawford case, the testimony in question was a statement that a co-defendant, Mrs. Crawford, made to the police. So it can't be simply under oath. It can't be limited to prior judicial proceedings. And the Supreme Court said in Crawford, I think, foreshadowing that there's going to be more litigation on this, hopefully in this court and other courts, what is the definition of testimonial evidence? Quote, we leave for another day any effort to spell out comprehensive definition of testimonial. Whatever else the term carvers, it applies at a minimum to prior testimony at preliminary hearings before a grand jury or a former trial and to police interrogations. These are the modern practices with closest kinship to the abuses which the Constitution clause was directed. Then it goes on and talks about the traditional exceptions to the hearsay rule are ones that are not testimonial and cites as examples for that business records, dying declarations. In this case, forgive me, my simple mind suggests that the evidence that was admitted was statements made supposedly, of course not subject to cross-examination, but statements supposedly made by Dr. Casey to friends that were then related in testimony during court. I believe that an argument can be very easily made that that's testimonial. The thing that concerns me the most is if the whole Crawford case seems to turn about, turn on the whole thing about how horrible it is to have uncross-examined evidence utilized to convict someone, he may have a situation where there's gossip that is admitted in a case where there was really no other evidence to convict. I mean, this is a character assassination, trash trial of John Casey. And I think that, and I really find this very interesting, and I think clearly none of us have heard the end of this. The Supreme Court clearly is asking for further definitions and interpretation of what really is testimonial. The Confrontation Clause, and I can just summarize that and then save whatever minutes I have left, issue is, I've mentioned it and it would be redundant to say it again. But basically, there were numerous statements supposedly attributed to Dr. Casey admitted into evidence under what was called a state of mind, exception to the hearsay rule,  And if someone testifies that, oh, you said Dr. Casey. Okay. Some of the statements that were admitted were the defendant's statements. Correct. And those were his admissions. Well, I don't know if you, there were some, supposedly Dr. Casey said to some of her friends that John had said such and such to her. Hearsay kind of mind. Right. And so then supposedly what John had said to Dr. Casey was related to others by Dr. Casey who then related it during testimony. But a number of those statements were very prejudicial, clearly. Basically, the state's theory of the case is that John Casey was a bad person and that's why he should be convicted. What about the exhaustion problem? Don't we have to determine where to reach the Confrontation Clause claim at all, that it was exhaustion? I'm having a little trouble hearing you. The exhaustion issue. Yes. Was the Confrontation Clause claim exhausted in state court? I think clearly it was. And I think Judge Quackenbush found that it was. I found it interesting to listen to the transcript of that because the Attorney General didn't even brief those issues, assuming that they hadn't been exhausted. And Judge Quackenbush was very upset with that and said, well, you can't just assume I'm going to agree with your position. He then very strongly suggested that they were exhausted. We raised those issues in the petition for discretionary review to the Supreme Court. The case recently cited by the state as supplemental authority, Baldwin v. Reese, was a case where the issue was raised in the Court of Appeals in Oregon but then not raised in the Supreme Court, which is different here because of the nature of the discretionary review in Washington's Supreme Court underpinned the notion that the claims were exhausted simply by raising them before the Washington Supreme Court. I believe this case supports that. I mean, the last Supreme — the last Washington State court action in this case was the Supreme Court, who was presented with the federal constitutional issues, denying it. And under this case or whatever it's called, that should be considered a decision on the merits. But do you have to present an issue in the intermediate Court of Appeals in order to be able to present it fairly to the State Supreme Court? I think that's — If the State court, Supreme Court hears it for the first time, and they take it up and write something about it and address it on the merits, clearly I think there's exhaustion, no problem. But if they just, you know, deny without opinion and don't grant discretionary relief, is there exhaustion from serving it up to them if it wasn't presented in the Court of Appeals? I believe it was. And I believe the cases support that. I think you have to look at each individual case — excuse me, each individual State as to how that process is. In Washington State — and we've cited a number of cases. Unfortunately, one of them was mine where the Supreme Court took an issue from the State, raised for the first time, that was not preserved in the Court of Appeals at State v. Eklund. So I think that under the case law and the federal case law, the decision by the Supreme Court of Washington, which clearly everyone admits the federal issues were presented to the Supreme Court of Washington, that that is substantive determination, the cases and the funny spelled case, FISC or whatever it is. I would also indicate that there seems to be an assumption in this case that the — these two issues were not preserved as federal constitutional issues in the Court of Appeals, and they were. And I think a reading of the record would indicate that they were. So that would answer my question. Or now hopefully answer it. They were presented in the Court of Appeals. That's correct. And we've cited that in our brief, and we believe that's been our position all along. I think that's why Judge Crackenbush actually got irritated and quite irritated with the State and the oral argument, the original oral argument in this case, because they just assumed they weren't, and therefore they weren't going to even address them. The last issue, and I don't even know. It's 56 seconds I have remaining. We are over. I'm already over my time. Okay. Thank you. Thank you. Good morning, and may it please the Court. My name is Paul Weiser. I'm an assistant attorney general appearing today on behalf of Appellee Moore in this case. And we're going to ask that this Court affirm the district court's decision, but not exactly as the district court adjudicated the case. We believe that two of the three claims that are before you on the merits today were not exhausted in the Washington State courts. Well, but maybe we could address, or maybe you could address the pretrial publicity issue first. That was clearly exhausted. Yes, it was, Your Honor. If we could grant appellant relief on that, I guess we wouldn't reach the other issues. I would think that that could potentially moot the other ones. So what's the State's position here as to whether appellant could get a fair trial with this jury in this town, you know, in light of the publicity? I must say I haven't been to Wenatchee in a while, but I once tried a case there. It's not like New York, you know. There's one paper, and if everybody's in a buzz about this, could he really get a fair trial? Your Honor, it's our position that not only could he, that he did, and that he was able to select an impartial jury through the volunteer process. And, in fact, the description we heard of much of what was on the jurors' minds and the gossip that they had heard and the media accounts that they had been exposed to, those jurors were excused. They did not even serve. I think what we have to look at is the jury that actually served in Mr. Casey's case. And when we examined their voir dire and the fact that the defense did not have any challenge for cause for those particular jurors, every challenge for cause that the defense lodged in this case was granted, and the defense got an additional three peremptory challenges at their request. The judge granted that, so they got nine rather than the usual six. At the time of the trial, Mr. Casey was satisfied that the jury that he had received was fair. He was not able to point his finger to anything that would indicate that these jurors had a fixed or inflexible opinion about the case that they would not be able to set aside. And, in fact, I think the extent of his desperation is expressed best at the time when he renewed his motion for change of venue. This was the first day of trial, and I believe it was immediately following the party's opening statements. Mr. Casey renewed his motion for change of venue. This can be found in the excerpts of record at page 134 through 136. And he says, we think there are too many people on this jury who have said they can be fair and impartial and that they can set aside these preconceived notions and ideas and opinions, and I just don't think they can. And then later he says, many people have said, well, it's difficult to put it aside, but, yes, if ordered, I can do that. I don't think that's true. And then, finally. Is that his counsel? I'm sorry. That's Mr. Casey's counsel. Yes, Your Honor. And not present counsel. This was his trial counsel. Mr. Brown said he didn't try this one. Correct. But later in that same motion, counsel stated, simply because we are not capable of challenging a person for cause does not mean that we feel comfortable with the juror. Now, that's not the standard for whether the jury is impartial or not. That's counsel's level of comfort with the jury. It's can these jurors swear to set aside any opinions they may have formed in the case, and in this case, there were very few of the jurors who ultimately were chosen to serve who expressed any kind of opinion in the case. The 12 who were chosen and who sat as jurors were able to evaluate the evidence fairly and to decide the case based solely upon the evidence that was presented in court. There is a presumptive prejudice kind of an argument that I think was being made as well. That's correct, Your Honor. I think even there, though, Your Honor, and those cases that are relied upon, and those specifically were Irvin v. Dowd, Riddell v. Louisiana, Shepard v. Maxwell, those are all vintage cases by now, and I think the more recent decisions, specifically Murphy v. Florida, that was a 1975 case that was cited in both parties' briefs. In that case, Justice Marshall made it clear that you really do have to look to the jurors who are chosen, and the burden is on the defendant to prove something, not just allege something, not just say that's a stealth juror and I know it and I can tell you, I've got a hunch, I just can't prove it. That's not the standard. They have to prove that the juror is unable to serve, unable to be impartial in the case, and that's all that Mr. Casey has really done at this point is just allege that there was this media saturation, this carnival atmosphere, however you want to put it, from the cases, again, the Irvin, the Riddell, and Shepard v. Maxwell cases, and compare the facts of those cases with the facts of this case. Like in Irvin, where there was this barrage of publicity immediately before trial, including all of the defendant's prior convictions, those were all played out, the fact that he confessed to 24 burglaries and 6 murders and is offered to plead guilty to the charge defense in exchange for receiving a life sentence rather than a death sentence, and that 8 of the 12 jurors in that case had formed an opinion about the defendant's guilt, and that they would take evidence to overcome this belief. Yes, I'm not sure those cases have been overruled, but they are pretty extreme. They're very extreme cases, Your Honor, and I believe that in Murphy v. Florida, the Supreme Court, if it can be said that they modified any standards from those 1960s vintage cases, it would be that the mere fact that this is a defendant who has received a lot of attention and notoriety in the press and his crime has received a lot of coverage in the press, that does not mean that you cannot pick a fair jury, and we believe that that's the case here. Well, what about the juror? Wasn't there one of the jurors who said, you know, I don't believe a gun can go off accidentally, which is the defense, but I can be fair? I mean, doesn't that show? Yes, Your Honor. At least that juror probably should not have been. I believe that that came out during individual vaude, Your Honor, and the juror's name was Diana Simpson, and that's at the supplemental excerpts of record, page 133. Was there a request to get rid of her for cause? There was not, Your Honor. I believe, actually, later in her voir dire, she explained what she meant by that. She didn't believe that guns fired or misfired accidentally, but she said that she was willing to listen to any expert testimony that was presented, and, in fact, there was going to be expert testimony in the case, and that was explained to her. So I believe that she would listen to the experts' opinions regarding guns and form any verdict in her mind based upon the testimony that she heard in court. Now, the little media coverage that was heard in this case, it's been described as a saturation, but as the trial court noted, all of the media attention to this case was in October of 1998, which was right around the time of the crime itself. And then there were a few more news stories in February of 1999. Those were eight months and four months before the trial even started. The trial didn't start until June 23rd of 1999. So any possible prejudice that may have occurred as a result of that media coverage had dissipated just by the passage of time. This wasn't as though on the eve of the trial there was a sudden barrage of news coverage about the case or facts that were not later admitted into evidence were revealed to the jury, nothing of the sort. This was relatively factual coverage with the exception of Dr. Casey's obituary, which appeared in October of 1998. But other than that, all of the news coverage was relatively just factual in nature, and in fact Mr. Casey was even able to suggest to the potential jurors, if you want to look at it that way, that his defense was going to be a defense of accident at trial. That was reported in one of the February accounts. But it was far from being a media saturation or the carnival atmosphere that was seen in either the actual prejudice cases or the presumed prejudice cases by the Supreme Court from the 1960s. Is all the publications in the press included in the record? You'd have to ask Mr. Casey's counsel. We didn't submit anything more than was already there. And I believe what's in the excerpts of record, and I don't have the page numbers in front of me, but near the beginning of the excerpts of record, I believe appended to the habeas corpus petition, are news accounts, news articles from the Wenatchee world during that period of time. I don't believe there are any more stories out there, and I believe if there had been and if they were particularly explosive or prejudicial, we would have seen them. And it is Mr. Casey's burden to establish his case that there was a media saturation or that there was extensive coverage of the trial. And we cannot discount the fact that the trial judge here was able to assess these jurors' credibility. When they were saying things like, I can be fair and impartial, I can listen to the opinions of expert witnesses on whether guns will accidentally discharge. It's up to the trial judge, who was there at the time, to assess whether that juror, in fact, is being truthful when he or she says that. And for that matter, jury impartiality is, as a matter of federal habeas corpus law, a question of fact. And state court findings of fact on such issues are entitled to a presumption of correctness. And I would cite Patton v. Yount, which is a case contained in our brief in this court. Although that case concerned PREA DEPA law under Section 2254D, that is the predecessor to the current version of Section 2254E. And we believe that Judge Allen's conclusions that these jurors could, in fact, serve impartially, is a finding of fact and is binding on this court. Before you get too far into your time, are you going to address the hearsay problems, the hearsay problems, the various statements that are challenged? Yes, Your Honor. And, in fact, before I get too far into that, I would point out that the question of the retroactive application of Crawford v. State of Washington on federal habeas corpus, I believe, is currently under submission by another panel of this Court. I'm aware that in the case of Day v. Duncan, Ninth Circuit Number 0355400, the Court requested and received supplemental briefing from the parties. I believe that's a habeas corpus case coming out of the State of California on that very issue, on the retroactive application of Crawford. Could you address exhaustion on the claims that Judge Canby's inquiring about? Are they properly before us? I believe that they are not, Your Honor, that they were not properly presented in Washington State courts and that the district court committed error by not concluding that the claims were unexhausted. You acknowledge they were presented to the State supreme court? That is correct, Your Honor. We do. Your position is they were not presented to the court of appeals? That's correct. We believe that they were, by presented, I guess I should qualify that, the claims were inserted in a petition for review that went before the Washington supreme court and that the Washington supreme court denied. We believe that that was not a fair presentation of the claims in light of the fact that the claims, and the two I'm referring to specifically are the Confrontation Clause claim and the prosecutorial misconduct claim, those claims were presented to the State court, the State court of appeals, the intermediate court of appeals here in Washington State as State law claims only, State evidentiary law and cited only to State cases. And it was only when they were presented to the Washington supreme court did they take on any kind of a Federal flavor. For the first time in the petition for review, there was a citation to Ohio v. Roberts. You would think if this had been a Confrontation Clause claim and then a Federal Constitutional Clause claim, that it would be presented to the State court of appeals with that case cited, because at that time, at least, that was the leading case on. Is there any authority set on the exhaustion issue as to whether, assuming they were presented to the court of appeals, contrary to your argument, then there's exhaustion? That's correct. But assuming that they weren't, if only State law issues were raised at the intermediate court of appeals, is there any authority on the issue whether the later presentation of them to the supreme court for discretionary review is a fair presentation for purposes of exhaustion? It's unfair presentation, Your Honor. Is that the point? Is there any authority either way? Right. Like I said, any authority whether it's a fair presentation. Right. We believe that the cases that would govern here, that would squarely govern the issue, would be Castile v. Peoples, which says that when an issue is presented for the first and only time to a State's highest court in a procedural posture in which it's unlikely to be reviewed, that that does not constitute fair presentation. I believe that this Court in Green v. Lambert, just a couple of years ago, made a holding that is, I describe it as dicta, and the reason it's dicta is because it was not this precise situation. But the Court did say in dicta that a party who presents Federal constitutional claims for the first time in that case I believe is a motion for reconsideration in the Washington Supreme Court. If the Washington Supreme Court had denied review in that case without comment, then the claims would not have been properly presented for Mr. Green's case. I think I understand the issues, at least on the exhaustion. Could you please get back to the merits on the confrontation issue? Yes, Your Honor. Judge Canby's questions. Right. It's our position that that testimony, although it's been described as nothing more than gossip or gossip-type evidence and character assassination, it was actually relevant because Mr. Casey had interposed a defense of accident. So in other words, his motive or lack thereof was made an issue by his assertion of that defense. Why isn't it hearsay? I mean, even apart from Proctor and its retroactivity, I don't know that that really has much bearing on this case because it doesn't strike me as testimonial hearsay, but it's hearsay. And the fact that it's relevant doesn't get it in. I mean, you've still got a confrontation problem, don't you? It did come in under an exception to the – a firmly rooted exception to the hearsay rule, and that was the state-of-mind exception. This was – It doesn't apply. I'm sorry? To any of the statements. The state-of-mind exception doesn't apply to many of the statements, as I think some of the courts have recognized. So they say, that's okay. It doesn't really apply because it has to be the declarant's state of mind. And you have third parties talking about Dr. Casey's state of mind. So then the court goes on and says, well, it comes under a motive or res gestae anyway, but that's only if it wasn't offered for the truth of the statement, and it was. Your Honor, I would disagree that this did not reflect her state of mind. I believe it did. It described the state of their marriage during a critical period of time, the two comes in under that exception only if it's the declarant's then existing state of mind. The declarant is the one who's saying the out-of-court statement. So it's not telling about the friend's state of mind. It's telling about the decedent's state of mind. That's correct, Your Honor. It was Mrs. Casey's state of mind, her belief in what the state of the marriage was during that period of time, and that's what was relevant. If she was willing to share this information with her friends and colleagues, she was probably sharing the same information with Mr. Casey, and that gave him a motive to want to kill her at that time. He thought that she was going to leave him. I have no doubt that the statements, well, maybe they do reflect Dr. Casey's state of mind, that in order for it to come in under that exception, you needed to have the person who wasn't in court. Well, never mind. I'm sorry. I'm going down the wrong track there. So your position is that it does fall within the state of mind exception? That's correct, Your Honor. Ann. So what you're saying is because this indicates her state of mind, which is really irrelevant, it becomes relevant because it really is about his state of mind, because she really must have said what her state of mind was to him, and then, therefore, that affects his state of mind. But that seems to me gets to Edward Law's point that it's the state of mind that's supposed to be the declarant's state of mind. She just got shot, and what her state of mind was doesn't really go to the elements of the offense. I believe it does, Your Honor. I believe it shows that in the months leading up to her getting shot, there was a reason she got shot, and that it wasn't accidental, that the state of the marriage was that fragile. That's his motive. That's his motive. It's her state of mind. The evidence, some of the hearsay that was admitted, obviously, was Mr. Casey's own hearsay. Of course, that isn't covered at all by the Confrontation Clause. We're just talking about statements by the victim. They indicated that this was a very rocky relationship that they had, that she was not being treated well, and that she was thinking of getting out of this relationship. And, Your Honor, Judge Cambion, a few moments ago, you said you didn't know if Crawford v. Washington, if its application means anything in this case. I think, actually, it would. You know, we would ordinarily argue Teague v. Lane and Section 2254d that this was not the existing Washington or U.S. Supreme Court precedent at this time. That the state courts reached their decision, so on and so forth. But even if Crawford does apply here, obviously, these statements by the victim to third persons were not testimonial in nature. So, I think, under either standard, the state... The statement made to an investigator, maybe that's a little arguing. Most of these statements clearly weren't testimonial. I'm not aware of any statements being made to an investigator, Your Honor, in this case. I think they are all to friends and colleagues and family members of the victim. And I see that I am out of time. I would request that the Court affirm the district court's judgment of dismissal, although on the different grounds that I have stated. Thank you. Thank you. Do you want a minute, Roberto? Counsel, we're going to talk to you. A few things. The last comment counsel made in response to Judge Wardlaw's comment, I think it shows how he doesn't understand the state of mind exception. You were right on track. And that's the danger in this case, because he was saying the state of mind exception would allow this evidence to come in to say, here's the motive. The marriage was rocky, so on and so forth. That's exactly what the state of mind exception does not allow, exactly. And that's what happened in this case. And even counsel continues that inappropriate analysis of the state of mind. To answer your other question, the newspaper reports, most of them are attached. There's talk in these newspaper reports about how well loved she was. There's comments about negative comments that Mr. Casey made. This is in the newspaper articles, things that he asked for insurance coverage early on. One of the most interesting ones that I found from the standpoint of the atmosphere, because I do think you need to look at the atmosphere when you're trying to pick a jury. When jurors say, I think I can be impartial, that's like, you know, if I ask my wife, do you love me, she says, I think so. I'm going to ask a few more questions. That's not the end of the inquiry. And you need to look at the atmosphere. And one of the newspaper articles in this case links Dr. Casey to sex abuse figures in the Wenatchee sex cases, which, of course, we all know now has turned out to be one of the greatest tragedies in American jurisprudence. I mean, what happened here in Mr. Casey's case was simply wrong. This is the kind of atmosphere, and this, unfortunately, is what happens in Wenatchee. And this is his last chance. I thank you for your attention. Thank you very much, Counsel. Casey v. Moore will be submitted, and this section of the Court is adjourned for today. All rise. The Court for this session stands adjourned. The Court is adjourned.
judges: Canby, Wardlaw, Gould